IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

SHERMAN DIVISION

| | | |
|---|---|---|
| RICHARD WILSON, #1792703 | § | |
| VS. | § | CIVIL ACTION NO. 4:14cv290 |
| JEFF DUNKIN, ET AL. | § | |

## MEMORANDUM OPINION AND ORDER OF DISMISSAL

Plaintiff Richard Wilson, a prisoner previously confined at the Buster Cole Unit of the Texas prison system, proceeding *pro se* and *in forma pauperis*, filed the above-styled and numbered civil rights lawsuit pursuant to 42 U.S.C. § 1983 against Dr. Jeff Duncan,[1] the Texas Department of Criminal Justice (TDCJ) and Warden John Werner. Dr. Duncan is the sole defendant remaining in the lawsuit. The present Memorandum Opinion concerns his motion for summary judgment (docket entry #47) and Wilson's response (docket entry #53).

### Plaintiff's Factual Allegations

The lawsuit was filed on May 5, 2014. Wilson states that he broke his tibial plateau in his right leg on March 17, 2013. He went to the infirmary and was examined by Nurse Gloria Fernandez. She called Dr. Jeff Duncan at home for instructions. Wilson was provided crutches, Ibuprofen and a cell pass. On March 19, 2013, Dr. Duncan examined Wilson. After completing x-rays, Dr. Duncan took away his crutches and lowered the dosage of Ibuprofen. Dr. Duncan told him

---

[1] Dr. Jeff Duncan noted that his last name is spelled "Duncan," as opposed to "Dunkin." The correct spelling shall be used for the remainder of this Memorandum Opinion.

1

that nothing was wrong with him. Wilson complains that he had to walk on his leg for a year without receiving any medical assistance from Dr. Duncan.

## Defendants' Motion for Summary Judgment

Dr. Duncan filed a motion for summary judgment (docket entry #47) on November 24, 2014. In support of the motion, he argued (1) that he is entitled to Eleventh Amendment immunity to the extent that he has been sued in his official capacity, (2) that Wilson has not shown that he had sufficient personal involvement to be liable, and (3) that he is entitled to qualified immunity with respect to Wilson's deliberate indifference to serious medical needs claim against him. In support of the motion, Dr. Duncan submitted relevant portions of Wilson's prison medical records, along with an affidavit from Dr. Steven Bowers.

The medical records, as explained by Dr. Bowers, reveal that Nurse Fernandez examined Wilson on March 17, 2013. Wilson reported that he slipped and fell on his knee while coming off of his top bunk. Nurse Fernandez observed that his right knee was slightly swollen, there was no redness nor bruising, that it was not hot to the touch, and that he had a limited range of motion. She also noted that Wilson's right ankle had no swelling and that he was ambulatory. She contacted Dr. Duncan by phone, who instructed her to provide Wilson Ibuprofen 600 mg. (1 tablet twice a day for ten days), crutches, an ice pack, a cell pass for five days, x-rays of the right ankle and knee, and a follow-up with a medical provider after the x-rays were taken. Later that afternoon, Wilson returned to the medical department with complaints of severe pain, that he could hardly move his toes and that the swelling in his knee had increased. Nurse Fernandez noted that the swelling to his knee was worse and that he continued to have a limited range of motion to his knee and toes. She contacted Dr. Duncan, who gave her no additional orders at that time.

On March 18, 2013, Dr. Duncan examined Wilson and found no fractures and assessed the patient with contusions. Wilson was provided a "medically unassigned" work restriction for six days. On March 21, 2013, a sick call request was received from Wilson seeking a second opinion. He was seen on the following morning by Physician Assistant Muldowney, who noted that Wilson moved without symptoms of discomfort and support; that there were no signs of trauma, deformity, contusion, atrophy, or ecchymosis (bruising); and that he had a full range of motion in his right hip, foot and ankle. PA Muldowney assessed Wilson as having a Grade I strain. His plan of care was a steroid (Deltasone 20 mg.) daily for ten days. He advised Wilson that he did not appear to meet the requirements for any type of disability or restrictions and advised him that orthopedic studies showed that the mainstay of treatment was a good exercise program.

On March 25, 2013, a report was submitted of x-rays taken on March 19, 2013. The x-rays confirmed that Wilson had not fractured his right ankle. On March 27, 2013, Wilson submitted a sick call request requesting an elastic wrap for his knee. A nurse at the unit provided a written response stating, "You were seen on 3-22-13 for this complaint. TDCJ policy prohibits issue of elastic wrap, and as explained to you by the provider, studies show that use of wraps and braces actually weaken the joint and cause further injury. Exercise to strengthen the muscles around the joint is the best treatment."

On March 28, 2013, Wilson submitted a sick call request asking for an MRI on his right leg. He indicated that he had a lot of stiffness, swelling and ailments going on after his fall on his right leg. He complained that he had not received adequate medical attention. He was informed that he had been seen for the same complaint within the past seven days and to follow-up next week. On April 1, 2013, he submitted a sick call request for an MRI of his right leg and a low bunk restriction. Nurse Wright examined Wilson. She noted no swelling and two bruises on the medial thigh approximately 3 inches

3

above the knee and one on the lateral calf approximately 2 inches below the knee. Wilson complained of severe pain inferior to the patella, pain to palpation over ligaments above knee, and with flexion of knee. He indicated that he could not pick up his leg without pulling up or grabbing onto his pant leg. He was scheduled to see a provider. He was seen by Dr. Duncan on April 2, 2013. Dr. Duncan noted that Wilson's ankle x-ray was normal and that there was no bruising. Dr. Duncan's plan of care was to order x-rays of Wilson's femur (thigh) and lower leg, a low bunk restriction for one month, and Ibuprofen 400 mg. tablets twice a day for sixty days.

On April 17, 2013, a radiology report for femur, tibia-fibula, and knees x-rays was submitted. The report noted that a nondisplaced subacute tibial plateau fracture could not be excluded. Wilson was scheduled to see a provider, but he left the clinic without being seen by a provider. On April 21, 2013, Wilson submitted another sick call request. He noted that he had to leave early for another lay-in. Dr. Duncan saw Wilson on April 23, 2013. He ordered an ankle x-ray and a CT scan of the knee. On May 1, 2013, a radiology report of Wilson's ankle x-ray was negative and showed no fracture or dislocation.

On May 31, 2013, Wilson was seen in sick call by Nurse Practitioner Davis for complaints that his knee symptoms were getting worse, along with unrelated medical complaints. NP Davis observed that Wilson's right patella (knee cap) was stable, there was no effusion (no fluid) of the knee, and mild crepitus (crackling or popping sound). NP Davis ordered Nortriptyline (an antidepressant that is also used to treat chronic pain).

On June 11, 2013, Wilson was transferred to Hospital Galveston for a CT scan of his right lower extremity. The CT scan revealed a non-displaced lateral tibial plateau fracture that showed interval healing. Dr. Bowers explained that the tibial plateau is the upper surface of the shin bone. A non-displaced fracture is when the bone sustains a break or crack without a fragment of the bone

becoming separated. Symptoms of tibial plateau fracture are swelling, pain in the joint, inability to bear weight on the injured side and bruising. A non-displaced fracture often heals within 3-4 months with no surgical intervention. The CT scan revealed no other fracture or dislocation, minimal soft tissue swelling present, and no significant joint effusion (fluid) present. Upon Wilson's return to his unit of assignment, Dr. Duncan ordered a low bunk restriction and a follow-up appointment with a unit provider. On June 17, 2013, Wilson was seen by NP Davis for the follow-up. NP Davis ordered a refill of Ibuprofen 600 mg. twice a day as needed, a cane pass for three months, and a request for a first available appointment with Orthopedics for evaluation of the non-displaced lateral tibial plateau fracture.

Wilson was seen in the Hospital Galveston Orthopedic clinic on October 21, 2013. The exam showed no effusion (fluid), range of motion 0 to 130 degrees, no crepitation (cracking or popping) or pain noted with range of motion, no joint line tenderness noted, stable to V/V (varus/valgus tests for weakness in the ligaments on the inside and outside of knee) stress, 1+ lachman anterior (tests for tear/stability of anterior cruciate ligament of knee; 1+ is minimally positive), 4/5 strength knee extension, 5/5 strength EHL/FHL extensor/flexor strength of great toe), sensation intact to light touch, and pulses were palpable. X-rays taken that day revealed the right tibial plateau fracture had healed and that Wilson's right quadriceps showed weakness. The plan was physical therapy to strengthen quadriceps.

Dr. Duncan saw Wilson for a follow-up regarding his Hospital Galveston Orthopedic visit on October 29, 2013. The records had not yet arrived; thus, Dr. Duncan requested the records.

On November 15, 2013, Wilson's Nortriptyline was increased to two capsules per his request. On January 23, 2014, he was ordered Ibuprofen 600 mg. three times daily. On February 18, 2014, Dr. Duncan renewed Wilson prescription for Ibuprofen to 400 mg. twice a day for 90 days. That was Dr.

Duncan's last encounter with Wilson. Wilson attended physical therapy from February 27, 2014 through August 18, 2014. Dr. Bowers expressed the opinion that he achieved good results.

Dr. Duncan's legal arguments in light of the medical records will be fully discussed in the Discussion and Analysis section of this Memorandum Opinion.

Wilson's Response

Wilson provided a response (docket entry #53) to the motion for summary judgment on January 22, 2015. He argued that Dr. Duncan failed to properly treat him for a year. He argued that Dr. Duncan is not entitled to Eleventh Amendment immunity because he failed to provide qualified medical care nor provide medical services in a timely manner. He stressed that Dr. Duncan was the primary care provider for the facility. He argued that Dr. Duncan is not entitled to qualified immunity because he failed to provide timely medical care. Wilson's response will be fully discussed in the Discussion and Analysis section of this Memorandum Opinion.

Discussion and Analysis

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party for summary judgment has the burden of proving the lack of a genuine dispute as to all the material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Galindo v. Precision American Corp.,* 754 F.2d 1212, 1221-23 (5th Cir. 1985).

In deciding a motion for summary judgment, the Court must make a threshold inquiry in determining whether there is a need for a trial. "In other words, whether there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly

supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." 477 U.S. at 247-48.

If the movant satisfies its initial burden of demonstrating the absence of a material fact dispute, then the non-movant must identify specific evidence in the summary judgment record demonstrating that there is a material fact dispute concerning the essential elements of its case for which it will bear the burden of proof at trial. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996). The non-movant cannot survive a motion for summary judgment by resting on the allegations in his pleadings. *Isquith v. Middle South Utilities, Inc.,* 847 F.2d 186, 199 (5th Cir.), *cert. denied*, 488 U.S. 926 (1988). Rather, he must direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 324. To carry this burden, the nonmovant must present evidence sufficient to support a resolution of the factual disputes in his favor. *Anderson*, 477 U.S. at 257. The non-movant must submit competent summary judgment evidence sufficient to defeat a properly supported motion for summary judgment. *See, e.g., Burleson v. Texas Dept. of Criminal Justice*, 393 F.3d 577, 589-90 (5th Cir. 2004); *Domino v. Texas Dept. of Criminal Justice*, 239 F.3d 752, 755 (5th Cir. 2001).

Dr. Duncan initially argued that he is entitled to Eleventh Amendment immunity with respect to Wilson's official capacity claims for monetary damages. The Eleventh Amendment provides that the State of Texas, as well as its agencies, are immune from liability. *Kentucky v. Graham*, 473 U.S. 159, 167 (1985). The Eleventh Amendment accordingly bars claims against a state brought pursuant to 42 U.S.C. § 1983. *Aguilar v. Texas Dept. of Criminal Justice*, 160 F.3d 1052, 1054 (5th Cir. 1998). In *Will v. Michigan Department of State Police*, 491 U.S. 58, 71 (1989), the Supreme Court held that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." The Supreme Court upheld the dismissal of the Michigan Department of State Police and its Director sued

in his official capacity. *Id.* The Fifth Circuit has thus "held that the Eleventh Amendment bars recovering § 1983 money damages from TDCJ officers in their official capacity." *Oliver v. Scott*, 276 F.3d 736, 742 (5th Cir. 2002). Dr. Duncan correctly argued that he is entitled to Eleventh Amendment immunity to the extent that Wilson has sued him for monetary damages for actions performed in his official capacity.

Dr. Duncan next argues that Wilson has not alleged sufficient personal involvement by him to sustain a § 1983 cause of action. In order to successfully plead a cause of action in a civil rights case, a plaintiff must ordinarily articulate a set of facts that illustrates the defendant's participation in the alleged wrong. *Jacquez v. Procunier*, 801 F.2d 789, 793 (5th Cir. 1986). Dr. Duncan is not liable to the extent that he has been sued merely because he occupies a supervisory role as the primary care provider at the unit because the doctrine of *respondeat superior* does not apply in § 1983 actions. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978). The Supreme Court recently held that the term supervisory liability in the context of a § 1983 lawsuit is a "misnomer" since "[e]ach Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). The Court rejected an argument that government officials may be held liable merely because they had knowledge or acquiesced in their subordinate's misconduct. *Id.* Under 42 U.S.C. § 1983, supervisory officials are not liable for subordinates' actions on any vicarious liability theory. A supervisor may be held liable if either of the following exists: (1) his personal involvement in the constitutional deprivation, or (2) sufficient causal connection between the supervisor's wrongful conduct and the constitutional violations. *Thompkins v. Belt*, 828 F.2d 298, 303-304 (5th Cir. 1987). Dr. Duncan may be liable only to the extent that he was personally involved in a constitutional deprivation or there was a sufficient causal connection between him and a constitutional violation.

The issue of whether Dr. Duncan may be liable requires an analysis of the controlling case law on the topic of the medical care that must be provided to inmates. Deliberate indifference to a prisoner's serious medical needs constitutes an Eighth Amendment violation and states a cause of action under 42 U.S.C. § 1983. *Estelle v. Gamble*, 429 U.S. 97, 105-07 (1976); *Jackson v. Cain*, 864 F.2d 1235, 1244 (5th Cir. 1989). "[I]nadequate medical care by a prison doctor can result in a constitutional violation for purposes of a § 1983 claim when that conduct amounts to deliberate indifference to [the prisoners's] serious medical needs, constitut[ing] the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Stewart v. Murphy*, 174 F.3d 530, 533 (5th Cir. 1999) (internal quotation marks omitted).

In *Farmer v. Brennan*, 511 U.S. 825, 835 (1994), the Supreme Court noted that deliberate indifference involves more than just mere negligence. The Court concluded that "a prison official cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to inmate health or safety; . . . the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

In *Domino v. Texas Department of Criminal Justice*, the Fifth Circuit discussed the high standard involved in showing deliberate indifference as follows:

> Deliberate indifference is an extremely high standard to meet. It is indisputable that an incorrect diagnosis by medical personnel does not suffice to state a claim for deliberate indifference. *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985). Rather, the plaintiff must show that the officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id.* Furthermore the decision whether to provide additional treatment "is a classic example of a matter for medical judgment." *Estelle*, 429 U.S. at 107. And, the "failure to alleviate a significant risk that [the official] should have perceived, but did not" is insufficient to show deliberate indifference. *Farmer*, 511 U.S. at 838.

239 F.3d 752, 756 (5th Cir. 2001).

The competent summary judgment evidence reveals that Dr. Duncan was responsive to Wilson's serious medical needs. On March 17, 2013, he received a call from Nurse Fernandez about Wilson's condition. He ordered Ibuprofen, crutches, an ice pack, a cell pass for five days and x-rays. Dr. Duncan examined him on the following day. He provided a medically unassigned work restriction for six days. The initial x-rays did not reveal any fractures. Wilson was seen by other medical personnel until he was seen by Dr. Duncan again on April 2, 2013. Dr. Duncan noted that the x-rays were normal, but he ordered additional x-rays of Wilson's femur and lower leg, a low bunk restriction and additional Ibuprofen. The new radiology report could not rule out a nondisplaced tibial plateau fracture; thus, Dr. Wilson ordered an ankle x-ray and CT scan of the knee. The ankle x-ray was negative. However, the CT scan revealed the non-displaced lateral tibial plateau fracture. Dr. Duncan then ordered another low bunk restriction and a follow-up appointment. Once again, other medical providers continued to prescribe medication. Wilson was seen by the Hospital Galveston Orthopedic clinic on October 21, 2013. The non-displaced lateral tibial plateau fracture had healed by then, although Wilson's quadriceps had weakened. Physical therapy was ordered. On February 18, 2014, Dr. Duncan saw Wilson for the last time. He prescribed Ibuprofen once again. The competent medical records reveal that Dr. Duncan was uniformly responsive to Wilson's serious medical needs. He did not refuse to treat him, ignore his complaints, intentionally treat him incorrectly, or engage in any similar conduct that would clearly evince a wanton disregard for any serious medical needs. The competent summary judgment evidence does not support an inference of deliberate indifference.

In his response to the motion for summary judgment, Wilson focused on delays in receiving medical care. A "delay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference, which results in substantial harm." *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993). There has been no showing of deliberate indifference on the part of Dr.

Duncan. Furthermore, Wilson has not shown that he suffered substantial harm due to deliberate indifference on the part of Dr. Duncan. Dr. Duncan is entitled to summary judgment on the claim that he was deliberately indifferent to Wilson's serious medical needs.

Dr. Duncan also argued that he is entitled to summary judgment based on qualified immunity. The defense of qualified immunity protects government officials performing discretionary functions from "liability for civil damages insofar as their conduct does not violate clearly established rights which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Lytle v. Bexar County, Tex.*, 560 F.3d 404, 409 (5th Cir. 2009). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011). "When properly applied, it protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (internal quotation marks omitted). Once asserted, the burden shifts to a plaintiff to demonstrate the inapplicability of the defense. *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cie. 2002); *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992). A two-step process has traditionally been employed in evaluating the defense of qualified immunity. *Saucier v. Katz*, 533 U.S. 194 (2001). In determining if a defendant is entitled to qualified immunity, the court evaluates whether the facts alleged show the officer's conduct violated a constitutional right, and whether the right at issue was clearly established at the time of the defendant's alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing *Saucier v. Katz*, 533 U.S. at 201). The court may consider these two prongs in any order. *Id.* at 236.

When applying the second prong, the court examines whether "the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates

11

that right." *al-Kidd*, 131 S. Ct. at 2083 (internal alterations and quotation marks omitted). The Fifth Circuit has observed that an official:

> does not lose qualified immunity merely because a certain right is clearly established in the abstract. It is clearly established that the government may not deny due process or inflict cruel and unusual punishments, but those abstract rules give officials little practical guidance as to the legality of particular conduct. Qualified immunity should not be denied unless the law is clear in the more particularized sense that reasonable officials should be on notice that their conduct is unlawful.

*Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (internal quotation marks omitted).

In the present case, as was already explained, Wilson has not shown a violation of his constitutional rights. Dr. Duncan is entitled to summary judgment based on the first prong of the qualified immunity analysis alone. There is no need to discuss the second prong. Nonetheless, he is also entitled to qualified immunity based on the second prong in the qualified immunity analysis. Wilson has not shown that Dr. Duncan's actions were objectively unreasonable in light of clearly established law during the period of time in question. Consequently, Dr. Duncan is entitled to summary judgment based on qualified immunity. His motion for summary judgment is meritorious in all respects. It is therefore

**ORDERED** that Defendant Duncan's motion for summary judgment (docket entry #47) is **GRANTED** and that the claims against him are **DISMISSED** with prejudice. It is further

**ORDERED** that all motions not previously ruled on are **DENIED**.
 **SIGNED this 11th day of February, 2015.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE